# EXHIBIT B

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **UNIVERSITY OF SOUTH FLORIDA** | | |
| **RESEARCH FOUNDATION, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **3:18-CV-0250-K** |
| **BRIT SYSTEMS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

### _MARKMAN_ ORDER

Before the Court is the parties' claim construction briefing. After consideration of the parties' opening and responsive claim construction briefs (ECF Doc. Nos. 60, 61, 63, and 64) and all supporting material filed with these briefs, the Court construes the disputed claim phrase.

**A. The Patent in Suit.**

There is one patent in suit in this case. This is U.S. Patent 6,630,937 (the "'937 patent"), which was granted on October 7, 2003, and is titled Workstation Interface For Use In Digital Mammography and Associated Methods.

The patent discloses a workstation interface for the display of mammographic and other medical images. According to the patent, the disclosed invention is a break though in how a practitioner views these images. The invention uses digital images, which allows for all the benefits of using digital data, including the ability to manipulate

the images using a computer processor. The invention also displays the images in a format that is similar to or mimics the views that a practitioner would see when viewing and analyzing a traditional film image. According to the patent, this gives the benefit of providing a system that practitioners are accustomed to using.

## B. Principles of Claim Construction.

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The Federal Circuit has held that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The Supreme Court has stated that the claims are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips*, 415 F.3d at 1312. A court looks to three primary sources when determining the meaning of claims: (1) the claims, (2) the specification, and (3) the prosecution history. *Markman*, 52 F.3d at 979. The claims of the patent must be read in view of the specification of which they are a part. *Id*. The specification consists of a written description of the invention which allows a person of ordinary skill in the art to make and use the invention. *Id*. This description may act as a dictionary explaining the invention and defining terms used in the claims. *Id*. Although a court should generally give such terms their ordinary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, so long as the special definition of the term is clearly stated in the patent specification

2

or file history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court starts with the claim itself, read in light of the specification. *See Vivid Technologies, Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999). While the claims themselves provide significant guidance as to the meaning of a claim term, the specification is generally dispositive as "it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1314-15. In addition to the claim language and specification, the prosecution history is often helpful in understanding the intended meaning, as well as the scope of technical terms in the claims. *See Vivid*, 200 F.3d at 804. In particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning. *Id.* Using these tools, the court construes only the claims that are in controversy and only to the extent necessary to resolve the dispute. *Id.* at 803.

The words of a claim are usually given their ordinary and customary meaning. *See Phillips*, 415 F.3d at 1312. Ordinary and customary meaning is the meaning the claim term would have to a person of ordinary skill in the art (e.g., field of the invention). *See id.* at 1313; *Markman*, 52 F.3d at 979. A person of ordinary skill in the art would read the claim term in the context of the entire patent, including the specification, not just the particular claim where the term appears. *Phillips*, 415 F.3d at 1313. There are instances where the ordinary meaning of claim language, as a person of skill in the art would understand it, "may be readily apparent even to lay judges,"

thereby requiring "little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314. In these situations, general purpose dictionaries are useful. *Id*.

Often, the court must determine the ordinary and customary meaning of the claim terms which have a certain meaning in a field of art. *Id*. The court can look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id*. These sources can include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of the technical terms, and the state of the art." *Id*. Aside from the written description and the prosecution history, the claims themselves also offer assistance as to the meaning of certain claim terms. *Id*.

When the intrinsic evidence, which is the patent specification and prosecution history, unambiguously describes the scope of a patented invention, reliance on extrinsic evidence, which is everything outside the specification and prosecution history, is improper. *See Vitronics*, 90 F.3d at 1583. While the Court may consult extrinsic evidence to educate itself about the invention and relevant technology, it may not rely upon extrinsic evidence to reach a claim construction that is clearly at odds with a construction mandated by the intrinsic evidence. *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

## C. The Disputed Phrases

The parties dispute the meaning of five phrases of the claims that the parties agree are not mean plus function claims under 35 U.S.C. §112(6) (2012). These are:

1.      "digitized mammogram" and "digitized mammography image" of claims 1, 2, and 17.

2.      "the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram" of claims 1 and 2.

3.      "greyscale values" and "grayscale values" of claims 1, 2, 3, 13, 14, and 17.

4.      "to display a mammogram image in a different form in each window with grayscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state" of claim 2.

5.      "digitized medical image" of claim 3.

The parties also dispute the construction of seven phrases that at least one party alleges are subject to 35 U.S.C. §112(6). These phrases are:

1.      "means for communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof" of claim 1.

2.      "means for receiving from the user communication means a control instruction for changing an illumination state in a displayed form and for

implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form" of claim 1.

3.     "said processor . . . being responsive to a signal from said input devices to transfer digitized image data from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as mammogram in each window under a predetermined illumination state" of claim 2.

4.     "said processor being adapted to receive further input from said input device related to the mammogram image in a selected window, said further input from said input device including input that selectively controls the grayscale values of the mammogram images in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state with which the mammogram image in the selected window is displayed to the operator" of claim 2.

5.     "means controllable by a signal from the user-operable device for transforming the image into a plurality of varying-resolution forms, each form having a different set of greyscale values" of claims 3 and 17.

6

6.      "means for displaying the forms on the display means, each form displayed within a different sector of the display means" of claim 3.

7.      "means for displaying a first form on the first monitor and a second form on the second monitor" of claim 17.

**D. Construction of Phrases Not Subject to 35 U.S.C. §112(6).**

1.      **"digitized mammogram" and "digitized mammography image"**

The parties dispute the meaning of "digital mammogram" and "digitized mammography image," which occur in claims 1, 2, and 17 of the '937 patent. While the parties each propose different constructions of these phrases, the parties agree that the two phrases should be construed to have the same meaning. The Plaintiff proposes that these two phrases do not need construction and in the alternative that the phrases should be construed to mean "digital image presentations of a human breast." The Defendant proposes that the phrases should be construed to mean "image or images of a patient's breast or breasts that have been produced by digitizing film or films of the breast image(s)."

It is clear from the parties' proposed constructions and briefings that the parties do not dispute that a "digital mammogram" and a "digitized mammography image" are digital images of a human breast. Both proposed constructions include that these images are digital and that they are images of a breast or breasts. The parties, therefore, do not dispute the readily understood plain meaning of the phrases.

JA027

The dispute between the parties lies in the source of the digital images. The Plaintiff's proposed construction does not specify the source of the digital images. This leaves open all ways to create or obtain a digital image. The Defendant's proposed construction requires that the images be produced by digitizing film of breast images. Under this construction, the only source of a digital image is a film image. In other words, under this construction, this element is only met when an x-ray film of a breast is first created, and that film image is then converted to digital format. Under this construction, other possible ways of obtaining a digital image would not meet the "digital mammogram" and "digitized mammography image" limitations of the claims.

The Plaintiff argues that the phrases are used in the claims with their plain and ordinary meaning, and that the Defendant's construction improperly limits the scope of the claims to a specific embodiment described in the invention. According to the Plaintiff, a person of ordinary skill in the art would read the specification and recognize that the applicant used the phrases with their plain and ordinary meaning instead of assigning a special meaning to the phrases and that the functioning of the described and claimed invention is not dependent on the source of the digital image.

The Defendant argues that its proposed construction is correct because it is consistent with the way that the applicant described the invention as a whole and that the Plaintiff's proposed plain and ordinary meaning and alternative construction would allow for creation of digital images by methods that were not available at the time of the invention. According to the Defendant, a person of ordinary skill in the art would

read the specification and understand the limitations on creation of digital images at the time of the invention and understand that the claims are limited to digital images that are produced from film images.

The Court construes the phrases "digital mammogram" and "digitized mammography image" to have their plain and ordinary meaning.

The Court disagrees with the Defendant's assertion that the digital images must be produced from film images. The Court agrees with the Defendant in that the specification describes one embodiment in which the digital image of that embodiment was produced by scanning a film image. In the description of this embodiment, the applicant describes the source of the digital image. The passage states:

> The source of the mammographic images used in this embodiment of the present invention is the I magclear R3000 x-ray film digitizer by DBA Systems (Melbourne, Fla.). The digitizer is capable of scanning films at 30 um/pixel and 16 bits/pixel. The standard x-ray films are 19.05 cmx28.86 cm, resulting in scanned images that are 6350x7620 pixels.

'937 patent, 4:37-43. The specification also references the digitized x-ray films in the discussion of the display of the digitized images on certain monitors. '937 patent 4:15-18. The specification also describes an autoscale function of the invention that that "takes into consideration the properties of the film and the digitizer, the monitors, and human vision and then matches them for optimal reading." '937 patent, 5:56-60.

The specification portions are insufficient to limit the claim scope to digital images produced from scanned images. The exemplary embodiment that describes obtaining a digital image by scanning a film image is just one possible example of an

9

embodiment of an invention. The patent in no way limits the scope of the claimed invention to this particular embodiment. The other few references to film images are even weaker support for limiting the claims in this manner. At most, they are passing references to considerations that must be taken into account when a film image is used as the original source of the digital image. They do not state that a film image must be the original source of the digital image.

The overall description of the invention in the specification also does not support the Defendant's proposed limited construction. The specification describes an invention that relates to the view and manipulation of a digital image for clinical use. The described invention is not an invention for converting film images to digital images. Because of this, the function and operation of the invention is largely independent from the source of the digital image. It makes little difference if the digital image was acquired by scanning a film image or by some other method. The invention can still fully function and operate by manipulating and displaying the digital image as described in the specification, regardless of the source of the digital image.

The Court is also not persuaded by the Defendant's argument that a construction that did not limit the source of the digital image to a film image would improperly include digitalization methods that were not yet in existence at the time of the invention. The Court first notes that the Defendant's argument as to this issue is primarily just that. It is attorney argument that is unsupported by evidence of the state of digital technology at the time. The main support for the Defendant's argument is

10

the introductory statement of the background of the invention section of the specification. This states that "[t]he imminent arrival of digital mammography brings with it a set of issues." '937 patent, 1:34-35. The Defendant appears to argue that this statement indicates that digital mammography did not exist or was in its infancy at the time of the invention, so the only way to obtain a digital image was to scan a film image. The statement does not do this or support that conclusion. The statement and the remainder of the background section of the specification indicate that clinical use of the digital mammography was not in common usage because of the issues that needed to be resolved. Some of which, according to the specification, are solved by the claimed invention. The Court also notes that the first three references cited in the specification also refer to then existing digital mammography systems and research, which indicates that digital mammography did exist at the time of the invention. For these reasons, the Court is not persuaded by the Defendant's argument that the claims must be limited to producing digital images from film images.

Since the invention claimed by the patent and described by the specification is not limited by the source of the digital image used in the invention and construction of this phrase to require that the digital image be produced by a film image would improperly import a feature of an exemplary embodiment into the claims, the Court declines to adopt the Defendant's proposed construction.

The Court agrees with the Plaintiff that the phrase does not need construction, and that it should be given its plain and ordinary meaning. Based on the parties briefing

11

and proposed constructions, it does not appear that there is an actual dispute as to what the plain and ordinary meaning would be. The dispute was over whether the patent limited the plain and ordinary meaning to a particular meaning. Both proposed constructions include the ideas that a "digital mammogram" is a digital image of a human breast, which is the plain and ordinary meaning of the phrase. The only dispute was over the source of the digital image.

Since the Defendant's proposed construction is not supported by the specification and "digital mammogram" and "digitized mammography image" are not assigned any special meaning in the specification, the Court construes both of these phrases to have the same meaning, which is their plain and ordinary meaning.

**2. "the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram"**

The parties dispute the meaning of "the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram," which occurs in claims 1 and 2 of the '937 patent. This phrase contains three other disputed phrases, which are "digitized mammogram data," "greyscale values," and "optical densities." The Plaintiff refers to this disputed phrase as a "universal term," and asserts that it is more proper to construe this disputed phrase as a whole than it is to construe the other three phrases individually.

The Plaintiff proposes that this phrase be construed to mean "regardless of how the digital mammogram is formed, i.e. from either direct digital of an x-ray film, the greyscale values of the image are substantially the same."

The Defendant proposes that the phrase be construed to mean "the digitized images of the patient's breast having greyscale values that correspond to optical densities of the film image of the patient's breast." In the alternative, the Defendant proposes that the phrase does not require construction, and appears to assert that the construction of the three individual disputed phrases that are contained within this phrase would be sufficient to give the proper meaning to the claim language.

The Defendant argues that the Plaintiff's proposed construction of this phrase is incorrect because it improperly rewrites the claims by adding "regardless of how the digital mammogram is formed, i.e. from either direct digital or an x-ray film." The Defendant argues that this language rewrites the claims because the claims do not contain any language about the digital image being formed by any method and does not provide specific examples, as the Plaintiff's proposed construction does. The Defendant also argues that the Plaintiff's proposed construction is incorrect because it inserts ambiguity and uncertainty into the claim by stating the greyscale values of the image as "substantially the same," but fails to specify what the greyscale values are substantially the same to.

The Court agrees with the Defendant's assertion that the Plaintiff's proposed construction of this phrase would improperly rewrite the claims. The Plaintiff requests

13

that the construction include a specific statement that asserts that the source of the digital image does not matter and specific examples of how the digital image could be produced, which are by direct digital or from an x-ray film. The claims, as written, do not include either of these. The applicant chose the claim wording as written and should be held to that claim wording. The applicant did not specifically assert in the claims that it does not matter how the image was produced and certainly does not provide examples of how to do this. The Court will not redraft these claims for the benefit of the Plaintiff's litigation position in this matter. In addition, the Court has already construed "digitized mammogram data" above. In this construction, the Court has already addressed the dispute between the parties regarding any limitation on the source of the digital image. The construction of that phrase alone is sufficient to address the issue. Further construction of this phrase on that point is not helpful in understanding the meaning of the claims.

The Court does find that construction of the word "corresponding" in this phrase would be beneficial to the jury in understanding the meaning of this phrase. The phrase requires that the greyscale values of the digital image correspond to the optical densities of the film mammogram image. This could be interpreted by a jury as a requirement that the digital image is produced from a film image and that there must be an actual film image. As explained by the Court in the construction of "digitized mammogram data," this is not the case. The specification does not describe an invention that must use a film image as the source of the digital image. The

specification does not even describe an invention in which there must be an actual film image.

The specification does, however, describe an invention in which the digital image appears similar in nature to a film image. According to the specification, it is beneficial for the digital images to look like film images. The similar appearance of the two assists practitioners in becoming accustomed to using the digital mammography display systems. '937 patent, 1:65-67, 5:5-20. Because the digital image looks like a film image when viewed, practitioners do not have to learn a completely different way to read and interpret digital mammography images. The reference to the greyscale values of the digital image corresponding to the optical densities of the film image address this aspect of the invention described in the specification.

In order to avoid this possible ambiguity and misinterpretation of the claim language, the Court will construe "corresponding." The definition of "correspond" is "to be analogous or equivalent in character, form, or function." The words of this definition better explain what is meant in the claims by "corresponding" than simply using the word "corresponding." This definition also better conveys that the digital image should appear similar to a film image by explaining that the greyscale values of the digital image are analogous to or equivalent to the optical densities of a film image in character, form, or function.

JA035

The Court finds that the remainder of the disputed phrase does not need construction beyond the construction of the three other disputed phrases contained within this disputed phrase.

For these reasons, the Court construes "the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram" to mean "the digitized mammogram data having greyscale values analogous or equivalent in character, form, or function to the optical densities of the film mammogram," along with the Court's construction of the three other disputed phrases.

### 3. "greyscale values" and "grayscale values"

The parties dispute the meanings of the phrases "greyscale values" and "grayscale values," which are used in claims 1, 2, 3, 13, 14, and 17 of the '937 patent. The parties note that the only difference between these two phrases is the spelling of greyscale, that these are two alternative spellings for the same word, and that both phrases should be given the same meanings.

The Plaintiff proposes that the phrases should be given their common and ordinary meaning of "digital image luminance values corresponding to shades of grey from black to white." The Defendant proposes that the phrases should construed to mean "numerical values representing a range of grays between white and black." The parties, therefore, agree that greyscale values are some kind of values that represent different intensities of grey that range from white to black. The parties dispute the

16

nature of the "values" that represent this range. The Plaintiff asserts that the values are luminance values. The Defendant asserts that the values are numerical values.

In support of its proposed construction that the values are luminance values, the Plaintiff argues that other claim language, the specification, and the commonly understood meaning of greyscale values support its proposed construction. The Plaintiff points to the full claim language of these phrases in claims 1 and 2. The relevant portion of claim 1 is "means for receiving digitized mammogram data corresponding to a film mammogram image, the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram image." '937 patent, 8:61-65. Claim 2 also contains similar language describing the greyscale values corresponding to optical densities of a film mammogram image. '937 patent, 9:21-26. The Plaintiff argues that this claim language makes clear that the greyscale values correspond to luminance values.

The Plaintiff also argues that the specification also supports a construction of greyscale that refers to luminance values instead of numerical values. In support of this, the Plaintiff points to specification sections that, like the claims, refer to the greyscale values being representative of the luminance values and the appearance of film images.

The Defendant argues that "greyscale values" should be construed so that the values are numerical values. In support of this, the Defendant argues that the common and ordinary meaning is inconsistent with the Plaintiff's proposed construction and that greyscale is simply "a series of shades from white to black." The Defendant,

17

however, fails to explain why this series of shades from white to black must be a numerical value.

The plain and ordinary meaning of grayscale is a reference to a series of shades from white to black. The parties appear to agree with this based on their proposed constructions and briefings. The Court disagrees with the Defendant's assertion that the greyscale values must be numerical values and that the Plaintiff's proposed construction improperly ties the values to the luminance of the digital images.

The Court finds that the claim language supports a construction of "greyscale values" that relates the greyscale values to the luminance of the images. Claim 1 requires "means for receiving digitized mammogram data corresponding to a film mammogram image, the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram image." '937 patent, 8:61-65. Claim two also contains similar language. '937 patent, 9:21-26. This limitation requires 1) that the digital mammogram data corresponds to a film image and 2) that the data has greyscale values that correspond to the optical densities of the film image. The first limitation is another disputed claim phrase that the Court has already construed above to mean that the digitized mammogram data has greyscale values analogous or equivalent in character, form, or function to the optical densities of the film mammogram. The second limitation requires that greyscale values correspond to optical densities of the film. This means that these greyscale values are analogous or equivalent in character, form, or function to the optical densities of the film. The

18

optical densities of the film determine how dark or light the particular areas of the film are. In areas having higher optical densities, less light passes through the film creating a darker spot. In areas having lower optical densities, more light passes through the film creating lighter spots. The optical densities affect the amount of light that passes through a particular area. In this manner, the film displays an image by varying the amount of light that passes through particular areas of the film. Likewise, a particular pixel of a screen displaying a greyscale digital image has a certain amount of light emitted from it. The amount of light emitted from a particular pixel is the luminance of that pixel. The greyscale data of the digital image corresponding to that particular pixel controls how much light will be displayed from that particular pixel, relative to the other pixels. In this manner, an image is created on the screen using varying intensities of light and dark pixels. Therefore, the greyscale values of the digital image correspond to the optical densities of the film image by controlling the luminance values of the digital image, as described by the Plaintiff's proposed construction of "greyscale values," which is "digital image luminance values corresponding to shades of grey from black to white."

Likewise, other claim language supports this construction. Claim 2 requires the system to "display a mammogram image in a different form in each window with greyscale values, that along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state" and "input that selectively controls the greyscale values of the mammogram

image in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state." '937 patent, 9:36-53. These limitations require a predetermined illumination state of the image. This predetermined illumination state is the luminance of the image, which is in part determined by the greyscale values of the image. Claim 2 also requires the ability of an operator to control the illumination state of the image by adjusting the greyscale values. Both of these requirements confirm that the greyscale values are related to luminance values that are used to affect the amount of light emitted from the screen to display the digital image.

The specification also supports the Plaintiff's proposed construction which relates the greyscale values to the luminance of the image. The specification describes an invention that depicts digital mammography images in a manner that is similar to the way practitioners view film mammography images. For example, the specification describes that an object of the invention is to provide a workstation that is comparable to the existing way to read mammograms that depicts the image as closely as possible the standard mammography viewbox. '937 patent, 1:65-67; 4:48-50. These descriptions of the invention, which describe that the invention intends to present the digital mammogram data in a way comparable to the way film mammograms are displayed, supports a construction that relates the greyscale values to luminance because, as discussed above, the correspondence between the luminance of the pixels displaying a digital image to the optical densities of a film image is what makes the digital display look similar to a film mammogram.

The Court does not agree with the Defendant's assertion that the values must be numerical values. The Defendant provides little to no support for this assertion as to why these values must be numerical. In addition, the Court finds a requirement that greyscale values be numerical values is inconsistent with the plain and ordinary meaning of "greyscale values." The plain and ordinary meaning of greyscale values is a range of shades from white to black. This does not include any required concept of assigning a numerical value to each possible shade. Instead greyscale values involve the concept of lighter and dark shades.

Since the claim language and the specification support a construction of greyscale values that describes a range of shades from white to black and that relates the greyscale values to luminance of the displayed digital image, and since there is no support to require that the values be particular numerical values, the Court construes "greyscale values" and "grayscale values" to mean "digital image luminance values corresponding to shades of grey from black to white."

**4. "to display a mammogram image in a different form in each window with grayscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state"**

The parties dispute the meaning of "to display a mammogram image in a different form in each window with grayscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state," which occurs in claim 2 of the '937 patent.

21

The Plaintiff proposes that the phrase be construed to mean "capability to concurrently display on each window with greyscale values that, along with illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state."

The Defendant proposes that the phrase is indefinite. In the alternative, the Defendant proposes that the phrase be construed to mean "display concurrently on different windows of a display screen different image versions of a single mammogram image, each image version having a range of grays between white and black automatically assigned in advance to the image version and represented by different numerical values."

The Court first addresses the Defendant's assertion that the phrase is indefinite. If the phrase is indefinite, this would render the claim invalid. This phrase relates to the display of the digital mammogram data in a way so that it "appears to a user as a mammogram." The phrase recites two conditions that affect how this data appears to a user as a mammogram. The first are the greyscale values. The second are the illumination characteristics of monitor.

The Defendant argues that the claim is indefinite because the claim requires the illumination characteristics of the monitor to be factors that make the digital mammogram image in a way that appears to a user as a mammogram. The Defendant argues that the specification does not provide any explanation as to what these characteristics are or how they would be combined with the greyscale values to produce

22

an image that appears to a user as a mammogram. According to the Defendant, this renders the claim indefinite because it fails to inform a person skilled in the art of the scope of the invention with reasonable certainty.

For a claim to be definite, a claim must inform a person of ordinary skill in the art as to the scope of the claim, considering the specification and the prosecution history. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 2120, 2129 (2014). A claim that fails to do this is invalid because it is indefinite. *Id.*

The Court disagrees with the Defendant's assertion that this phrase is indefinite. Display monitors all have particular characteristics that affect the way that an image is displayed and the way that a user would perceive that image. This includes both adjustable and non-adjustable characteristics, such as the overall brightness and contrast ranges of the display and the particular brightness or contrast setting of the display within the overall range. These are just a few examples of the type of characteristics that affect the perception of an image of a display and various different types of displays or monitors may have various other characteristics that likewise determine a user's perception of the image displayed. These characteristics would be known to a person skilled in the art, and a person of ordinary skill in the art would understand that these characteristics combined with the particular characteristics of the image being displayed affect the appearance of the displayed image to a user. In the case of this phrase, it is the greyscale values that in combination with these characteristics that produces an image that appears as a mammogram to a user.

JA043

The specification also supports this conclusion. The specification discusses some of the characteristics of the monitors used in the exemplary embodiments. The specification states:

> The characteristics of display monitors 14, 16 are important to proper implementation of the present invention. Screen film mammography is interpreted on viewboxes with an average luminance of about 3000 nit (880ft-L), which gives excellent back-lighting to x-ray films. In contrast, the typical color monitor provided with the Sun workstations is only about 30 ft-L. The maximum display resolution of 1280x1024 pixels with standard monitors is not enough for x-ray films digitized at 30 um/pixel, which are in the range of 3000x5000 pixels. Dome Imaging Systems Inc. (Waltham, Mass.), manufactures 5-megapixel display cards for the Sun that are capable of driving high-resolution grayscale monitors. The monitors 14, 16 chosen are the DR-110 from Data Ray Corp (Westminister, Colo.). These are 2048x2560 pixels at 74 Hz, with a luminance of 120 ft-L and 30 transmissivity.

'937 patent, 4:9-24. This passage specifically discusses some of the monitor characteristics that are important to consider in producing an image, such as the luminance, resolution, and transmissivity of the monitor. A person of ordinary skill in the art would understand that it is the combination of these and other possible characteristics of the monitor in combination with the greyscale values that affect the ultimate appearance of the image that is displayed.

In addition, the scope of the claim phrase is focused on the ultimate appearance of the image to a user, not on the particular characteristics of the monitor that are used to produce that appearance. A person of ordinary skill in the art, knowing what

characteristics would affect the appearance of the image, would understand that the scope of the claim focuses on using a monitor with the characteristics needed to produce an image that appears to a user as a mammogram.

Since a person of ordinary skill in the art would understand the scope of the claim in the context of the patent as a whole, the Court holds that this phrase is not indefinite.

The Court now turns to the proper construction of this phrase.

The Plaintiff proposes that the phrase be construed to mean "capability to concurrently display on each window with greyscale values that, along with illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state."

As an alternative to the phrase being indefinite, the Defendant proposes that the phrase be construed to mean "display concurrently on different windows of a display screen different image versions of a single mammogram image, each image version having a range of grays between white and black automatically assigned in advance to the image version and represented by different numerical values."

These two proposed constructions are similar in that they both require concurrent display of images. The Defendant's proposed construction specifically states this is done in different windows on the same monitor. The Plaintiff's version does not specifically recite that the windows are on the same monitor. However, considering the claim language that proceeds this language, it is clear from the claims that the windows

25

are on the same monitor. This portion of the claim states the image data is transferred to the monitor "in a way that causes the monitor to produce a display having a plurality of windows." '937 patent, 9:32-37. This language makes clear that the windows are on the same monitor. Therefore, there is little substantive difference between this part of the two proposed constructions.

The Court does not see any benefit to including in the construction of this phrase that the different windows are on one display screen, like the Defendant's construction does. The claim language that precedes this disputed phrase already requires this. Including this in the construction of this phrase is duplicative and does not add any further clarity to the meaning of the phrase or claim.

One difference between the two constructions concerns the different images that are displayed in the different windows. The Defendant's proposed construction requires that the mammogram images displayed in the different windows be different versions of a single mammogram. The Plaintiff's construction does not require this. The claim language also does not specifically state that different forms of the images are different forms of a single mammogram.

Even though the Defendant adds this language into its proposed construction, the Defendant does not provide any argument or support for including this additional language. For this reason, the Court sees no reason to divert from the claim language, which does not have the "single mammogram" requirement.

The other difference between the Plaintiff's and the Defendant's proposed construction relates to the construction of "greyscale values," which is used in this phrase. In the construction of "greyscale values," the Defendant proposed that the values must be numerical values. The Defendant incorporates this proposed construction of "greyscale values" into the construction of this phrase.

The Court has already addressed the construction of "greyscale values." In that construction, the Court rejected the Defendant's proposed numerical value language. The Court sees no reason to further address "greyscale values" in the context of this disputed phrase.

Since the disputed phrase is not indefinite; the Plaintiff's proposed construction is consistent with the claim language and the invention described in the specification; and the Defendant provides little argument or support for its proposed construction, the Court construes "to display a mammogram image in a different form in each window with grayscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state" to mean "capability to concurrently display on each window with greyscale values that, along with illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state."

## 5. "digitized medical image"

The parties dispute the meaning of "digitized medical image," which is used in claim 3 of the '937 patent. The Plaintiff proposes that the phrase be given its plain and

ordinary meaning, and, in the alternative, the phrase should be construed to mean "an image of a portion of a human body in a digital format." The Defendant proposes that the phrase should be construed to mean "image of a patient's breast that has been produced by digitizing film of the breast image."

There are two disputes in the construction of this phrase. The first dispute is the same one that was presented in the construction of "digitized mammogram" and "digitized mammography image," which is a dispute over the source of the digital image. The Defendant asserts that the digital image must be produced from a film image. The Plaintiff asserts that the correct construction of the phrase should not limit the source of the digital image. In the construction of "digitized mammogram" and "digitized mammography image," the Court explained that the claims should not be limited so that the source of the digital image is a film image, as proposed by the Defendant, because a broader interpretation is supported by the claims and the specification. This phrase, which simply changes "mammography" to "medical" is no different. On this issue, this claim should be construed consistent and analogous to the Court's constructions of "digitized mammogram" and "digitized mammography image," which do not include this limitation.

The second dispute between the parties regarding the construction of this phrase is whether the image can be an image of any part of the body, as asserted by the Plaintiff, or if the image must be an image of a breast, as asserted by the Defendant.

28

The Defendant asserts the meaning of the phrase should be limited to an image of a breast, even though the phrase does not contain any language limiting the image to a breast image. The Plaintiff argues that such a construction would improperly limit the clear scope of the phrase.

In support of its construction that limits the image to an image of a breast, the Defendant argues that arguments made by the applicant during prosecution of the application require this limitation on the meaning of the phrase. During prosecution, the Examiner rejected the pending claims based on a prior art reference, the Marshal reference. In response to this rejection, the applicant amended some claims and provided argument explaining the differences between the claims of the application and the disclosure of Marshal. The Defendant points to these argument statements to support its conclusion that medical images are limited to images of breasts.

Specifically, the applicant stated that "[t]he present invention claims a system for providing an interface between a digitized mammogram and a user." Def. Appx., Doc. No. 132-1 at 36. The applicant also stated, in another portion of the response, that "Claims 2 and 3, although slightly different, substantially recite the underlying steps performed by Claim 1. As claim 1 has been shown to be patentably distinct over Marshall, it is believed that claim 2 and 3 are also patentably distinct over Marshal for the reasons given above." *Id.* at 38. The Defendant argues that these two statements characterize all claimed inventions as being systems for mammogram, and because of this all claims should be limited to mammograms or images of breasts.

29

The Court is not persuaded by the Defendant's argument and finds that that the prosecution history does not support limiting medical images to images of breasts. The Court first notes that the two statements cited by the Defendant in support of its argument are two sentences excerpted from more than three and a half pages of argument and explanation as to the differences between the rejected claims and the Marshal reference. *Id.* 34-38. None, or at the most, very little of this argument focuses on the claims being directed toward mammography only and attempts to distinguish the rejected claims from Marshal because the claims are for a system for providing an interface for a mammogram. Instead, the arguments are directed toward distinguishing features of the invention that have nothing to do with whether the image being depicted is an image of a breast. *Id.* This does not amount to a clear limitation of the scope of all claims to images of breasts only.

In addition, other claim language supports this conclusion. Dependent claim 6, which depends from claim 3, requires "the medical image comprises a mammographic image." '937 patent, 10:12-13. The doctrine of claim differentiation does not support the Defendant's limitation on the meaning of the phrase. The doctrine of claim differentiation does not support a construction of a phrase that would limit the scope of an independent claim to that of a claim from which it depends. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). To do so would negate the distinction between the scope of the independent claim and the dependent claim. In this case, construing the phrase "digital medical image" so that it would be limited to

an image of a breast would eliminate the difference in the scope of claims 3 and 6. Under such a construction, both claims would be directed toward mammograms, i.e., images of breasts.

In addition, this difference between claim 3 and claim 6 negates the Defendant's argument that the applicant misrepresented the scope of the claims and limited the scope of claim 3 to mammograms. The Examiner was aware of the fact that other independent claims specifically required mammograms while claim 3 only required a digital medical image and that claim 6 further limited claim 3 by requiring a mammogram. Under a clear plain reading of all of these claims, the Examiner could not have been misled or confused by the applicant's remarks so that the Examiner thought that all of the claims required mammograms. Therefore, the applicant's characterization of the scope of the claims would not have misled the Examiner. In addition to this, the applicant specifically points out that claim 3 varied in scope from claim 1. Def. Appx., Doc. No. 132-1 at 38.

Since the phrase "digital medical image" was not limited in scope to images of breasts and the described and claimed invention is not limited to an invention in which the digital image is produced from a film image, the Court construes "digital medical image" to have it plain and ordinary meaning.

**E. Construction of Phrases Alleged to be Subject to 35 U.S.C. §112(6).**

> **1. "means for communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof"**

The parties dispute the construction of "means for communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof" which occurs in claim 1. The parties agree that this phrase is a means plus function claim element that is subject to 35 U.S.C. §112(6).

A means plus function claim under 35 U.S.C. §112(6) recites a function in the claim language without specifically reciting a structure to perform that function. *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378-80 (Fed. Cir. 2014). This leaves the claim scope open to multiple possible structures that can perform that function. *Id.* The claim, however, is not unlimited in scope so that it covers any possible structure that could perform that function. *Id.* Instead, the claim scope is limited to structures that are disclosed in the specification and to equivalents of those disclosed structures. *Id.* If a specification fails to disclose a structure to perform the claimed function, the claim is invalid because the scope of the structure that performs the function is not defined. *Id.* In the case of means plus function claims directed toward software, when the claimed function is a computing step, the appropriate structure to perform this function is not a general computer processer. *Id.* The structure must be

the combination of the general processor and the algorithm that is used to accomplish the claimed function. *Id.* The algorithm is the series of steps that the processor is programmed to perform to accomplish the function. *Id.* Because of this, the disclosure of only a generic processor is insufficient disclosure of structure to perform this type of claimed function. *Id.* The specification must also disclose the algorithm. *Id.* The algorithm may be described in any number of manners, such as in prose or in a flow chart type diagram. *Id.* An algorithm is properly disclosed if a person of ordinary skill in the art can read the patent as a whole and determine what steps the processor uses to accomplish that function. *Id.* If this cannot be done, then the claim is invalid for failing to disclose the structure that performs the recited function.

The parties agree that the claim phrase at issue here is a processing step implemented by a generic processor. The parties dispute whether the patent discloses the algorithm performed by the generic processor. The Plaintiff asserts that a sufficient algorithm is disclosed and the claim is valid. The Defendant asserts that the patent does not disclose an algorithm and that the claim is invalid.

The parties agree that the function of the phrase is "communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof."

The Plaintiff asserts that the algorithm portion of the structure that performs this function is disclosed in Figure 3 of the patent. Figure 3 depicts a flowchart

33

containing a number of steps related to implementation of the invention. This includes steps for selecting a case to be viewed; loading preview images; displaying the preview images; displaying converted forms of the image, in which the bit rate of the images have been reduced, the resolution of the images has been reduced, and the greyscale levels of the images have been modified. The flowchart also contains further references to windowing the views, providing a measurement tool, providing overlays, and providing reports.

The Defendant argues that, even though this figure describes some of the operation of the invention, the steps of this figure are not a processing algorithm, but are instead a step wise description of how the user interacts with the invention's interface. According to the Defendant, this is insufficient to show the steps used to accomplish the agreed function.

The Court finds that the steps depicted in Figure 3 are sufficient to show the steps that are performed to accomplish the agreed function. The agreed function is communicating with a monitor to display the multiple forms of the image. Each form should be in a different window, and each form should have a predetermined illumination state corresponding to the greyscale values of the form.

As discussed above, Figure 3 includes steps of selecting a new case, which is step 301; loading the original images, step 304; modifying the original images in a number of manners including adjusting the greyscale levels of the images, steps 305-308; and then displaying those modified images in windows, step 310. The operation of these

34

steps are also described in the specification section discussing Figure 3. '937 patent, 4:60-5:38. These steps correspond to the agreed function of communicating the modified images to a monitor. Just because portions of the section discussing this figure are from the perspective of a user, this does not render these steps insufficient to communicate to a person of ordinary skill in the art the steps that a processor must perform to communicate the modified images to a monitor.

The Plaintiff has proposed that the structure that performs this function be construed to be "[a] workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation, the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3, for example, step 308, thereby causing the display of binary information having different illumination states in different monitor windows."

While the Plaintiff's proposed construction captures the structure as a workstation processor performing the steps of Figure 3, the Court disagrees with the Plaintiff that this proposed structure provides a clear explanation of the structure for a jury to understand. The proposed structure contains a substantial amount of unnecessary or unwarranted language that does nothing to provide a clear definition of the structure. For example, the references to "executing one or more instructions stored on a computer-readable storage medium of the workstation" and "when executing the instructions" do not add any clarity to the structure because these are things that

35

computer processors normally do. At best they are redundant, but they also might confuse a juror. Also, the language "thereby causing the display of binary information having different illumination states in different monitor windows" does not do anything to clarify what the structure is that performs this function. Instead, this language relates more to the function. The parties have already agreed to a function, and incorporation of additional functional language into the structure confuses these concepts.

The Court construes the structure of this means plus function phrase to be "a workstation processor performing the algorithm of Figure 3, and equivalents." This structure captures the necessary and disclosed structure that performs the agreed function. It is agreed that a workstation processor is part of the structure. The algorithm that the processor performs is that which is described in Figure 3. A structure that simply includes these two required structure components is sufficient to define this structure.

**2. "means for receiving from the user communication means a control instruction for changing an illumination state in a displayed form and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form"**

The parties dispute the construction of "means for receiving from the user communication means a control instruction for changing an illumination state in a displayed from and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form,"

36

which occurs in claim 1. The parties agree that this phrase is a means plus function phrase that is subject to 35 U.S.C. §112(6).

The parties almost agree that the function for this phrase is "receiving from the user communication means (e.g., user I/O device) a control instruction for changing an illumination state in a displayed form and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form." The Plaintiff proposes the function as written. The Defendant proposes the same function, except without the portion in parenthesis, (e.g., user I/O device). So, the parties agree about the function, except for whether the function should provide "user I/O device" as an example of a communication means.

The parties dispute the structure that performs this function. The Plaintiff proposes that the structure is "[a] workstation processor 10, Figures 1 and 2, and is equivalents, receiving a control instruction by selection of one or more button 402, and 404-406, and equivalents thereof, the workstation processor 10 executing the control instruction to implement step 308 of the processing algorithm of Figure 3, or its equivalents, to make greyscale adjustments to control the illumination state of each displayed form." Like in the previous construction, the Plaintiff relies on the flowchart steps of Figure 3 to support its proposed structure. The Defendant asserts that the phrase is indefinite because the patent fails to disclose an algorithm that is performed by the general processor.

As discussed above, the flowchart of Figure 3 depicts a number of steps involved in the manipulation and display of a mammogram image. In order to be sufficient structure, the steps of Figure 3 must disclose the process that is used by the processor to accomplish the function. The agreed portion of the function requires two functions. The first is to receive a control instruction for changing the illumination state of the displayed images. The second is to implement those control instructions that were received. Together, receiving and implementing the instructions allows a user to control the illumination state of the images.

Therefore, if the flowchart of Figure 3 and the specification's related discussion of Figure 3 discloses an algorithm that supports these functions, the Figure and specification must provide the steps for both receiving and for implementing the control instructions to adjust the illumination state of the image. The Plaintiff points out that the specification states that the "user selection is then read by the workstation processor 10 executing the control instruction at step 308 of FIG. 3 (XIL Image Library), causing the generation of instructions to control illumination via changing of the greyscale values." Pla. Opening Claim Construction Brief, Doc. No. 136 at 35. The various sections of the specification cited by the Plaintiff mention or discuss features of the invention that include the identification of the processor for adjusting the greyscale of an image, the ability of a user to interact with the interface to send a command to the processor to adjust the greyscale of an image, and that the processor

38

changes the greyscale of the image. *See* '937 patent, 3:45-48; 4:66-5:1; 5:39-44; 6:6-12; 2:20-30; 5:14-17; 4:28-32.

The Court has fully reviewed all of the specification and figures cited by the Plaintiff in support of its conclusion that the specification has a description of an algorithm used to accomplish the functions of the phrase, and the Court disagrees with the Plaintiff that the patent discloses algorithms for the two functions of this phrase.

One of the functions of this phrase is to implement the control instruction to adjust the greyscale levels of an image. While the specification discusses that the invention has the capability to adjust the greyscale of an image in response to a user request, the specification fails to disclose how this is done. Instead of explaining the steps in the process to implement the instructions, the specification simply states that the greyscale levels are adjusted. This is not an algorithm, which is a series of steps that the processor uses to accomplish the function. Instead, at most, the specification simply states that the greyscale is adjusted, which is no different than stating the function of the phrase, and is not the structure of the phrase.

The figures cited by the Plaintiff do not provide any further support to show the steps that the processor uses to adjust the greyscale. In support of this, the Plaintiff points to step 308 of Figure 3. Step 308 simple states "analysis window with all four views, adjust greyscale." '937 patent, Figure 3. The only reference in step 308 regarding the greyscale is a simple assertion that the greyscale is adjusted. This is not a series of steps performed by the processor to adjust the greyscale. In addition, step 308 alone is

only one step in a process. An algorithm cannot be one step alone. It must be a series of steps. So, like the specification sections, the figures do no more than to state the function of adjusting the greyscale. They do not explain how the greyscale is adjusted.

The Plaintiff also argues that, given the disclosure that is made in the patent, a person of ordinary skill in the art could implement a way to adjust the greyscale of an image, so there is adequate disclosure of a structure.

The Court is not persuaded by this argument. The requirement to disclose the appropriate structure in the specification is a requirement to limit the scope of the claims by specifically identifying the structure that is covered by the claim. *Triton Tech*, 753 F.3d at 1378-80.  The fact that a person of ordinary skill in the art could devise some undisclosed way to accomplish the claimed function does not provide this limitation on the scope of the claim. *Id.* Therefore, it does not relieve the applicant from disclosing the structure that performs a claimed function. *Id.*

Since the agreed function of this phrase includes the function of implementing control instructions to adjust the greyscale value of an image; this function is accomplished by a generic computer processor in combination with an algorithm; and the specification fails to disclose the algorithm used by the processor to accomplish this function, the Court finds that the specification fails to disclose a structure to accomplish this function and that the claim phrase is indefinite. Since this claim phrase is indefinite, the entire claim is indefinite and is invalid.

3. "said processor ... being responsive to a signal from said input devices to transfer digitized image date from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as mammogram in each window under a predetermined illumination state" and

"said processor being adapted to received further input from said input device related to the mammogram image in a selected window, said further input from said input device including input that selectively controls the grayscale values of the mammogram images in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state with which the mammogram image in the selected window is displayed to the operator"

The parties dispute the constructions of "said processor . . . being responsive to a signal from said input devices to transfer digitized image date from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as mammogram in each window under a predetermined illumination state" and "said processor being adapted to received further input from said input device related to the mammogram image in a selected window, said further input from said input device including input that selectively controls the grayscale values of the mammogram images in the selected window, thereby enabling an operator handling said input device to selectively control the

41

illumination state with which the mammogram image in the selected window is displayed to the operator," both of which occur in claim 2.

The parties dispute whether these two phrases are means plus function phrases that are subject to 35 U.S.C. §112(6). The Plaintiff asserts that they are not means plus function phrases. The Defendant assert that they are.

A means plus function claim phrase may be drafted in multiple ways. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-53 (Fed. Cir. 2015). The most common way to do this is to use the words "means for" followed by a description of the claimed function. *Id.* When an applicant uses this language, the claim is presumed to be a means plus function claim subject to 35 U.S.C. §112(6). *Id.* Other claims, that do not use "means for" claiming, may also be means plus function claims. *Id.* This happens when the claim language uses a nonce word, which is a general construct that does not connote any type of structure to a person of ordinary skill in the art. *Id.* Examples of nonce words that commonly do not describe a structure are "mechanism," "element," and "device." *Id.* These words do not describe any particular structure, so use of these words in a claim may cause the claim to be subject to 35 U.S.C. §112(6). *Id.* However, if a claim phrase does not use "means for" claiming, there is a presumption that the phrase is not subject to 35 U.S.C. §112(6). *Id.*

The Defendant asserts that these two disputed phrases are both subject to 35 U.S.C. §112(6) because they use the word "processor." According to the Defendant, the word "processor" is insufficient to convey any particular structure to a person of

42

ordinary skill in the art, and because of this "processor" is a nonce word that makes the phrases means plus function phrases subject to 35 U.S.C. §112(6).

The Plaintiff asserts that a person of ordinary skill in the art would understand that a processor is a known structure. For this reason, the Plaintiff asserts that the phrases are not means plus function phrases. The Plaintiff also points out that the remainder of language of the phrases and other claim language require a number of structural connections to the processor, which further indicates that the claimed "processor" is a structural component of the claim.

The Court agrees with the Plaintiff's assertions that the claimed "processor" conveys sufficient structure and the claim phrases are not means plus function phrases that are subject to 35 U.S.C. §112(6). The Court first notes that the phrases do not use "means for" claiming. For this reason, there is a presumption that the phrases are not means plus function phrases. *Williamson*, 792 F.3d at 1349-50. While this presumption exists, the Court also acknowledges that the presumption is not a strong presumption. *Id.* This supports the conclusion that the phrases are not means plus phrases.

The word "processor" has a known and understood meaning to a person of ordinary skill in the art. Processor is not a word like "mechanism" or "device." These words are generic words that could refer to any possible structure. For this reason, they do not convey any particular structure to a person of ordinary skill in the art. A

43

processor, however, is a known structure. It a structure that receives input, manipulates data according to the processor's programing, and provides output.

That this is a structure in the claim is also made clear by the structural connections between the components of the claim. Some of the structural components of the claim are a monitor and electronic storage medium. '937 patent, 9:15-29. Both the monitor and the storage medium are required to be in circuit communication with the claimed processor. In order to be in circuit communication with the monitor and the storage medium, the processor must be a structure.

Since "processor" is a word that connotates a structure to a person of ordinary skill in the art and the claims specify structural connections to the processor, the Court holds that these phrases are not means plus function phrases that are subject to 35 U.S.C. §112(6). Since the only constructions that the parties provide of these phrases are means plus function constructions, there is no need for the Court to further construe these phrases.

**4. "means controllable by a signal from the user-operable device for transforming the image into a plurality of varying-resolution forms, each form having a different set of greyscale values"**

The parties dispute the construction of "means controllable by a signal from the user-operable device for transforming the image into a plurality of varying-resolution forms, each form having a different set of greyscale values," which occurs in claims 3 and 17 of the '937 patent. The parties agree that this phrase is a means plus function phrase that is subject to 35 U.S.C. §112(6). The parties also agree that the function of

this means plus function claim is "transforming the image into a plurality of varying-resolution forms." The parties dispute whether or not the specification discloses a structure to perform this function. The parties agree that the claimed function is accomplished by general computer processor, but dispute whether the specification discloses an algorithm that the processor uses to accomplish this function.

The Plaintiff proposes the structure is "[a] workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation, the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3, thereby changing the pixel sizes of binary information to form a plurality of varying forms each with different greyscale based on signals from user input devices."

The Defendant proposes that this claim phrase is indefinite because the specification does not disclose a structure that performs the claimed function.

In support of its assertion that the specification discloses an algorithm that the processor uses to accomplish this function, the Plaintiff points to the process described in Figure 3 of the patent. As discussed above, Figure 3 describes some of the steps that are implemented during use of the invention. This includes steps of loading a case file, step 301; loading the original images, step 304; processing the original images to convert them from 16 bit to 8 bit, step 305; creating decimated views of the image, step 306; and adjusting the greyscale of the image, step 308.

The Court agrees with the Plaintiff that these steps are a description of the steps or algorithm that the processor uses to accomplish the agreed function. The agreed function is "transforming the image into a plurality of varying-resolution forms." These steps describe this process, which includes loading the images, converting the images from 16 bit to 8 bit, and creating decimated views of the images.

The specification describing these steps supports the interpretation of the flowchart of Figure 3 as an algorithm used to transform the images into different resolution forms. The specification states, "Depending on the preferred reading style of the radiologist, panning can occur in either the decimated or the high-resolution windows. It turned out that a common practice is to scan through the image in the decimated view but pan in the high-resolution view for a thorough and slow examination of certain regions of interest." '937 patent, 5:32-38. This section makes clear that there are "high-resolution" views and "decimated" views, the decimated views being low resolution views. The steps of Figure 3, mentioned above, are used by the processor to convert the high resolution images to low resolution decimated images, which is the agreed function. Therefore, the patent discloses the structure that performs this claimed function, which is a processor performing the steps described in Figure 308.

The Court, however, does not agree that the Plaintiff's proposed structure is the best way to define this structure. Like the Plaintiff's proposed structures of other means plus function phrases, the Plaintiff's proposed structure for this phrase includes

46

unnecessary and potentially confusing wording. This includes the references to executing one or more instructions stored on a computer readable storage medium. This language is simply not necessary. The Plaintiff's proposed structure also contains language that focuses more on the function that on the structure. The Plaintiff proposes that the structure include "thereby changing the pixel sizes of binary information to form a plurality of varying resolution form each with a different greyscale based on signals from user input devices." This language is not structural language. It is functional language that should not be included in the construction of the structure.

The Court holds that the correct structure of this phrase is "a workstation processor performing the algorithm of Figure 3, and equivalents." This structure corresponds to the structure disclosed in the patent without adding any unnecessary, confusing, or improper language.

### 5. "means for displaying the forms on the display means, each form displayed within a different sector of the display means" and "means for displaying a first form on the first monitor and a second form on the second monitor"

The parties dispute the constructions of "means for displaying the forms on the display means, each form displayed within a different sector of the display means," which occurs in claim 3 and "means for displaying a first form on the first monitor and a second form on the second monitor," which occurs in claim 17.

The Court construes these two phrases collectively because of the similarities between the phrases. Claim 3 is directed toward a version of the invention in which

different versions of an image are displayed in different windows of the same display. '937 patent, 9:55-10:5. Claim 17 is directed toward a version of the invention in which different versions of an image are displayed on two different screens. '937 patent, 10:50-65. The two disputed phrases both relate to displaying the images with the claim 3 phrase requiring display of images in different sectors of the display and the claim 17 phrase requiring display of images on a first and second monitor.

The parties present disputed but very similar functions for the claim 3 phrase. The Plaintiff proposes that the function of this phrase is "displaying the forms on the display means (e.g. monitors), each form in a different sector (window)." The Defendant proposes that the function is "displaying the forms on the display means, each form displayed within a different sector of the display means." The substantive difference between the two proposed structures is that the Plaintiff's proposed construction provides examples of a display means and a different sector, which are "monitors" and a "window," respectively. The Defendant's proposed function does not include these examples. The Plaintiff provides little support for including its examples, besides a footnote in its briefing. The Defendant does not address this difference.

The Court finds that there is no support for including the specific examples of "display means" and "sector" in the construction of the function of this phrase. The Court construes the function of this phrase to be "displaying the forms on the display means, each form displayed within a different sector of the display means."

48

The parties agree that the function of the second phrase, which is the claim 17 phrase related to the use of two monitors, is "displaying a first form on the first monitor and a second form on the second monitor."

The parties dispute the construction of the structure of both of these phrases. Like the other means plus function phrases, the Defendant asserts that the phrases are indefinite because the functions are performed by a generic computer processor and the specification does not disclose an algorithm that the processor uses to accomplish these functions. The Plaintiff asserts that the flowchart of Figure 3 provides the algorithms used to accomplish the functions.

The Plaintiff proposes that the structure of the claim 3 phrase, which relates to multiple sectors of a display means, should be "[a] workstation processor 10, Figures 1 and 2, and equivalents thereof executing one or more instructions stored on a computer-readable storage medium of the workstation processor 10, when executing the instructions, preforming the processing algorithm of Figure 3, step 308, causing the display of binary information in different spatial resolutions in different monitor windows."

The Plaintiff proposes that the structure of the claim 17 phrase, which relates to the use of multiple monitors, be "[a] workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer readable storage medium of the workstation, the workstation processor 10, when executing instructions, performing the processing algorithm of Figure 3, and hardware (display

49

driver) operative to display a first form on a first monitor and a second form on a second monitor."

So, both of the Plaintiff's proposed structures for these phrases are largely the same as the Plaintiff's proposed structures for the other disputed means plus function phrases. They include that the structure is a processor that performs the steps shown in Figure 3. They also, like the other proposed structures, contain functional language. In the case of the claim 3 phrase, this functional language states that binary information is displayed in different monitor windows. In the case of the claim 17 phrase, this functional language states that a first form is displayed on a first monitor and a second form is displayed on a second monitor. The Plaintiff's proposed structure of the claim 17 phrase is slightly different than other proposed structures in that it also includes "hardware (display driver)" as part of the structure. The Plaintiff, however, does not provide any briefing on why this should be included in the structure of this phrase or why it would not also relate to the structure of the claim 3 phrase.

The Court agrees with the Plaintiff's assertion that the patent discloses adequate structure to perform the functions of these phrases. It is agreed that these functions are accomplished using a generic computer processor. The parties dispute whether the patent sufficiently discloses the algorithm that the processor uses to perform these functions. As discussed above, Figure 3 depicts a flow chart that includes the steps the system uses to provide an interface to the user. These steps include loading, manipulating, and rendering images to be displayed to the user. Therefore, the steps

50

involved in this flowchart are the steps that are used by the processor to display the images to the user. This is an algorithm for this process.

The specification and other figures further make clear that the images may, in some versions of the invention, be displayed in multiple windows or sectors of the same display, or, in other versions of the invention, be displayed on different monitors. The specification states "a dual-step monitor setup was selected (Figs. 1 and 2) to accommodate simultaneous multiple image display." '937 patent, 4:24-26. Figures 1 and 2 also depict two monitors, monitors 14 and 16. The specification also states "a case may contain a single-view or standard four view mammograms (left and right medio-lateral, ML; left and right cranio-caudal, CC). It may also contain processed versions of the originals . . . . After a case is selected and the preview images loaded (block 302), an initial full-size overview (block 303) is presented, as shown in Fig. 3. . . . . The CC views are displayed on one of the two monitors 14,16 of the workstation, the ML views on the other . . . ." '937 patent, 5:2-11. These specification descriptions of the invention clearly describe the invention as using the process depicted in Figure 3 to display multiple images, some of which may be in multiple windows on one monitor and others which may be on different monitors. This further supports the conclusion that the algorithm that the processor performs to accomplish the functions of these phrases is the process described in Figure 3, which can be used to display images in multiple sectors on one monitor, like in the claim 3 phrase, or to display images on different monitors, like in the claim 17 phrase.

51

While the Court agrees with the Plaintiff's proposed structure of these phrases to the extent that they include a processor performing the steps shown in Figure 3, the Court does not agree with the remainder of the Plaintiff's proposed structures. Like the Plaintiff's proposed structures for other means plus function phrases, the Plaintiff's proposed structures of these phrases include unnecessary language regarding the execution of instructions stored on a storage medium. The Plaintiff's proposed structures also contain functional language. The Court declines to adopt these portions of the Plaintiff's proposed constructions. The Plaintiff's proposed construction of the claim 17 phrase also includes a reference to "hardware (display driver)" as part of the structure. As noted above, the Plaintiff provides no briefing or argument to support inclusion of a generic statement that "hardware" is part of the structure that performs this function and no support to include a "display driver" as a specific example of this generic "hardware." Since the Plaintiff has not provided any reason why these should be included in the structure of this phrase, the Court declines to adopt this portion of the phrase.

Since the patent discloses that the functions of these phrases are performed by a computer processor performing the steps shown in Figure 3, the Court holds that the patent discloses adequate structure for these functions and that the phrase is not indefinite. The Court construes the structure of both of these phrases to be "a workstation processor performing the algorithm of Figure 3, and equivalents."

**F. Agreed Constructions**

The parties have presented to the Court a number of agreed constructions of terms and phrases. The Court adopts all agreed constructions of the parties as the constructions of the Court.

**SO ORDERED.**

Signed March 6th, 2019.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

## SUMMARY CHART OF CLAIM CONSTRUCTIONS OF

## DISPUTED TERMS OF '937 PATENT

| Language of Disputed Phrase of Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction | Judge's Construction |
|---|---|---|---|
| **"digitized mammogram"** <br><br> **"digitized mammography image"** | No construction required or in the alternative: <br><br> "digital image presentations of a human breast" | "image or images of a patient's breast or breast that have been produced by digitizing film or films of the breast image(s)" | Plain and ordinary meaning |
| **"greyscale values"** <br><br> **"grayscale values"** | No construction required or in the alternative: <br><br> "digital image luminance values corresponding to shades of grey from black to white" | "numerical values representing a range of grays between white and black" | "digital image luminance values corresponding to shades of grey from black to white." |
| **"to display a mammogram image in a different form in each window with grayscale values that, along with the** | "capability to concurrently display on each window with greyscale values that, along with illumination characteristics of | Phrase is indefinite and claim is invalid, or in the alternative: <br><br> "display concurrently on different windows of a display screen | "capability to concurrently display on each window with greyscale values that, along with illumination characteristics of |

| | | | |
|---|---|---|---|
| **illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state"** | said monitor, appears to a user as a mammogram in each window under a predetermined illumination state" | different image versions of a single mammogram image, each image version having a range of grays between white and black automatically assigned in advance to the image version and represented by different numerical values" | said monitor, appears to a user as a mammogram in each window under a predetermined illumination state" |
| **"digitized medical image"** | Plain and ordinary meaning, which is "an image of a portion of a human body in a digital format" | "image of a patient's breast that has been produced by digitizing film of the breast image" | Plain and ordinary meaning |
| **"the digitized mammogram data having greyscale values corresponding to optical densities of the film mammogram"** | "regardless of how the digital mammogram is formed, i.e. from either direct digital of an x-ray film, the greyscale values of the image are substantially the same" | "the digitized images of the patient's breast having greyscale values that correspond to optical densities of the film image of the patient's breast" | "the digitized mammogram data having greyscale values analogous or equivalent in character, form, or function to the optical densities of the film mammogram" |

55

| **"means for communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof" of claim 1.** | Function:<br><br>"communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof"<br><br>Structure:<br><br>A workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation processor 10, when executing the instructions, performing the processing | Function:<br><br>"communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof"<br><br>Structure:<br><br>No disclosed structure because there is no algorithm disclosed to perform the recited function. The claim term is indefinite. | Function:<br><br>"communicating with a monitor to display the plurality of forms, each form within a different window on the monitor, and each form having a predetermined illumination state corresponding to the greyscale values thereof"<br><br>Structure:<br><br>A workstation processor performing the algorithm of Figure 3, and equivalents. |

JA076

| | algorithm of Figure 3, for example, step 308 thereby causing the display of binary information having different illumination states in different monitor windows. | | |
|---|---|---|---|
| **"means for receiving from the user communication means a control instruction for changing an illumination state in a displayed from and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form"** | Function:<br><br>"receiving from the user communication means (e.g., user I/O device) a control instruction for changing an illumination state in a displayed form and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form"<br><br>Structure: | Function:<br><br>"receiving from the user communication means a control instruction for changing an illumination state in a displayed form and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form"<br><br>Structure: | Function:<br><br>"receiving from the user communication means a control instruction for changing an illumination state in a displayed form and for implementing the control instruction upon the displayed form, thereby permitting the user to control the illumination state of each displayed form"<br><br>Structure: |

57

| | A workstation processor 10, Figures 1 and 2, and its equivalents, receiving a control instruction by selection of one or more of buttons 402, and 404 – 406, and equivalents thereof, the workstation processor 10 executing the control instruction to implement step 308 of the processing algorithm of Figure 3, or its equivalents, to make greyscale adjustments to control the illumination state of each displayed form. | No disclosed structure because there is no algorithm disclosed to perform the recited function. | No disclosed structure because there is no algorithm disclosed to perform the recited function. Phrase is indefinite. |
|---|---|---|---|
| **"said processor … being responsive to a signal from said input devices to transfer digitized** | The phrase is not a means plus function claim element and does not need any construction. In | The phrase is a means plus function phrase subject to 35 U.S.C. §112(6). | The phrase is not a means plus function phrase subject to 35 U.S.C. §112(6). |

| | | | |
|---|---|---|---|
| **image date from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as mammogram in each window under a predetermined illumination state"** | the alternative, if the phrase is a means plus function phrase, then the Plaintiff proposes the following structure and function.<br><br>Function:<br><br>transfer digitized image date from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state. | Function:<br><br>transfer digitized image date from said electronic storage medium to said monitor in a way that causes the monitor to produce a display having a plurality of windows and to display a mammogram image in a different form in each window with greyscale values that, along with the illumination characteristics of said monitor, appears to a user as a mammogram in each window under a predetermined illumination state.<br><br>Structure:<br><br>No disclosed structure because there is no algorithm disclosed to perform the recited function. | No construction necessary. |

| | | | |
|---|---|---|---|
| | Structure:<br><br>A workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation, the workstation processor 10, when executing the instructions, performing the steps of the processing algorithm of Figure 3. | | |
| **"said processor being adapted to received further input from said input device related to the mammogram image in a selected window, said further input from said input device including input that** | The phrase is not a means plus function claim element and does not need any construction. In the alternative, if the phrase is a means plus function phrase, then the Plaintiff proposes the | Function:<br><br>receive further input from said input device related to the mammogram image in a selected window, said further input from said input device | The phrase is not a means plus function phrase subject to 35 U.S.C. §112(6).<br><br>No construction necessary. |

| | | | |
|---|---|---|---|
| **selectively controls the grayscale values of the mammogram images in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state with which the mammogram image in the selected window is displayed to the operator"** | following structure and function.

Function:

receive further input from said input device related to the mammogram image in a selected window, said further input from said input device including input that selectively controls the greyscale values of the mammogram image in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state with which the mammogram image in the selected window is displayed to the operator.

Structure:

A workstation processor 10, Figs. 1 and 2, and equivalents thereof, executing one or more | including input that selectively controls the greyscale values of the mammogram image in the selected window, thereby enabling an operator handling said input device to selectively control the illumination state with which the mammogram image in the selected window is displayed to the operator.

Structure:

No disclosed structure because there is no algorithm disclosed to perform the recited function. | |

61

| | | | |
|---|---|---|---|
| | instructions stored on a computer-readable storage medium of the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3 to receive user instructions from a user input device and make greyscale adjustments (to control the illumination state of each displayed form). A workstation processor 10, Figs. 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3 to receive user instructions from a user input device and make greyscale adjustments (to | | |

JA082

| | | | |
|---|---|---|---|
| | control the illumination state of each displayed form). | | |
| **"means controllable by a signal from the user-operable device for transforming the image into a plurality of varying-resolution forms, each form having a different set of greyscale values"** | Function:<br><br>transforming the image into a plurality of varying-resolution forms<br><br>Structure:<br><br>A workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation, the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3, thereby changing the pixel sizes of binary information to form a plurality of varying forms each with different greyscale based on | Function:<br><br>transforming the image into a plurality of varying-resolution forms<br><br>Structure:<br><br>No disclosed structure because there is no algorithm disclosed to perform the recited function. | Function:<br><br>transforming the image into a plurality of varying-resolution forms<br><br>Structure:<br><br>A workstation processor performing the algorithm of Figure 3, and equivalents. |

63

| | | | |
|---|---|---|---|
| | signals from user input devices. | | |
| **"means for displaying the forms on the display means, each form displayed within a different sector of the display means"** | Function:<br><br>displaying the forms on the display means (e.g., monitors), each form in a different sector (window)<br><br>Structure:<br><br>A workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation processor 10, when executing the instructions, performing the processing algorithm of Figure 3, step 308, causing the display of binary information in different spatial resolutions in different monitor windows. | Function:<br><br>displaying the forms on the display means, each form displayed within a different sector of the display means<br><br>Structure:<br><br>No disclosed structure because there is no algorithm disclosed to perform the recited function. | Function:<br><br>displaying the forms on the display means, each form displayed within a different sector of the display means<br><br>Structure:<br><br>A workstation processor performing the algorithm of Figure 3, and equivalents. |

| **"means for displaying a first form on the first monitor and a second form on the second monitor"** | Function:<br><br>displaying a first form on the first monitor and a second form on the second monitor.<br><br>Structure:<br><br>A workstation processor 10, Figures 1 and 2, and equivalents thereof, executing one or more instructions stored on a computer-readable storage medium of the workstation, the workstation processor 10, when executing instructions, performing the processing algorithm of Figure 3, and hardware (display driver) operative to display a first form on a first monitor and a second form on a second monitor. | Function:<br><br>displaying a first form on the first monitor and a second form on the second monitor.<br><br>Structure:<br><br>No disclosed structure because there is no algorithm disclosed to perform the recited function. | Function:<br><br>displaying a first form on the first monitor and a second form on the second monitor.<br><br>Structure:<br><br>A workstation processor performing the algorithm of Figure 3, and equivalents. |

65